BETSY C. MANIFOLD (182450)
*manifold@whafh.com*
RACHELE R. BYRD (190634)
*byrd@whafh.com*
ALEX J. TRAMONTANO (276666)
*tramontano@whafh.com*
FERDEZA ZEKIRI (335507)
*zekiri@whafh.com*
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LINDA MCCLELLAN, Derivatively on Behalf of Nominal Defendant MASIMO CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> JOE KIANI, MICAH YOUNG, BILAL MUHSIN, ELI KAMMERMAN, ADAM MIKKELSON, CRAIG REYNOLDS, MICHELLE BRENNAN, QUENTIN KOFFEY, JULIE A. SHIMER, and H. MICHAEL COHEN, <br><br> Defendants, <br><br> and <br><br> MASIMO CORPORATION, <br><br> Nominal Defendant. | Case No. **'24CV0781 AJB MMP** <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Linda McClellan ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Masimo Corporation ("Masimo" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Masimo, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Vasquez v. Masimo Corporation, et al.,* Case No. 3:23-cv-01546-L-DEB (S.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of Masimo against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least May 4, 2022 and August 8, 2023, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2.     Masimo is a global biotechnology company that primarily manufactures and sells non-invasive health monitoring solutions.

3.     Prior to 2022, Masimo exclusively sold healthcare products. In February 2022, the Company entered into an agreement to acquire Sound United, a consumer audio equipment company, for $1.025 billion, representing the largest deal in Masimo's history.

4.     Despite the fact that Masimo and Sound United operated in vastly

different industries, and the fact that Masimo Chief Executive Officer ("CEO") Defendant Joseph Kiani was advised both internally and by outside consultants against the transaction, Masimo completed the acquisition in April 2022.

5. The acquisition confused investors and caused Masimo's stock to decline dramatically. Indeed, in the wake of the announcement, Masimo lost $5.1 billion in market capitalization. According to a shareholder derivative complaint filed largely due to the ill-advised acquisition, "never before in the history of United States publicly traded companies has an acquiring company's market cap declined by more than *two* times, let alone *five* times the purchase price of the acquisition where the acquisition was material (*i.e.* 5% or more of the acquiring company's market cap."

6. After the acquisition, Masimo was plagued by rising inventory and stagnating sales in its new non-health care segment. The issues were exacerbated by pervasive deficiencies in the Company's internal controls and by a complete failure to integrate Sound United into the Company's existing operations. As demand for Masimo's healthcare products began to decline by the end of 2022, the Company lost its ability to compensate for its struggling non-healthcare segment.

7. Throughout the Relevant Period, the Individual Defendants issued materially false and misleading statements, touting purportedly strong demand for the Company's products across its business, significantly overstating Masimo's financial guidance, and concealing the rampant deficiencies in the Company's internal controls.

8. The truth eventually came to light over the course of a few months in 2023, when Masimo revealed dismal financial results for the second quarter of 2023 and substantially lowered its financial guidance for the full year of 2023. The announcements caused a precipitous decline in the price of the Company's stock, harming shareholders.

9. As a result of the foregoing, the Securities Class Action was filed

against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

10.     Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Masimo is headquartered in this District, Defendants have conducted business in this District, and a substantial

portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

*Plaintiff*

16.     Plaintiff is, and has been at all relevant times, a shareholder of Masimo.

*Nominal Defendant*

17.     Nominal Defendant Masimo is incorporated under the laws of Delaware with its principal executive offices located at 52 Discovery, Irvine, California 92618. Masimo's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "MASI."

*Individual Defendants*

18.     Defendant Joe Kiani ("Kiani") is the founder of Masimo and has served as its CEO and as the Chairman of its Board at all relevant times. According to the Company's public filings, Defendant Kiani received $16,511,436 in 2022 in compensation from the Company. As of March 31, 2023, Defendant Kiani beneficially owned 4,368,415 shares of Masimo stock, constituting 8.1% of the Company's total outstanding shares and worth $806,147,730.[1] Defendant Kiani was named as a defendant in the Securities Class Action.

19.     Defendant Adam Mikkelson ("Mikkelson") served as a member of the Board from October 2016 until February 2024. According to the Company's public filings, Defendant Mikkelson received $297,453 in 2022 in compensation from the Company. As of March 31, 2023, Defendant Mikkelson beneficially owned 2,673 shares of Company stock, worth $493,275.

20.     Defendant Craig Reynolds ("Reynolds") has served as a member of the Board since April 2014 and serves as Chair of the Compensation Committee and as

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $184.54 per share closing price of Masimo stock on March 31, 2023.

a member of the Nominating, Compliance and Corporate Governance Committee. According to the Company's public filings, Defendant Reynolds received $10,190,667 in 2022 in compensation from the Company. As of March 31, 2023, Defendant Reynolds beneficially owned 55,222 shares of Company stock, worth $10,190,667.

21.     Defendant Michelle Brennan ("Brennan") has served as a member of the Board since June 6, 2023 and serves as a member of the Compensation Committee and the Nominating, Compliance and Corporate Governance Committee.

22.     Defendant Quentin Koffey ("Koffey") has served as a member of the Board since June 6, 2023 and serves as a member of the Audit Committee.

23.     Defendant Julie A. Shimer ("Shimer") served as a member of the Board from April 2019 until June 6, 2023. According to the Company's public filings, Defendant Shimer received $297,453 in 2022 in compensation from the Company. As of March 31, 2023, Defendant Shimer beneficially owned 2,975 shares of Company stock, worth $549,006.

24.     Defendant H. Michael Cohen ("Cohen") served as a member of the Board from August 2018 until June 6, 2023. According to the Company's public filings, Defendant Cohen received $304,953 in 2022 in compensation from the Company. As of March 31, 2023, Defendant Cohen beneficially owned 2,388 shares of Company stock, worth $440,681.

***Officer Defendants***

25.     Defendant Micah Young ("Young") served as Masimo's Chief Financial Officer ("CFO") at all relevant times. According to the Company's public filings, Defendant Young received $2,450,085 in 2022 in compensation from the Company. As of March 31, 2023, Defendant Young beneficially owned 55,544 shares of Company stock, worth $10,250,089. Defendant Young was named as a defendant in the Securities Class Action.

26.     Defendant Bilal Muhsin ("Muhsin") served as Masimo's Chief Operating Officer ("COO") at all relevant times. Defendant Muhsin has been employed by Masimo for more than twenty years, and prior to serving as COO, Defendant Muhsin served as EVP of Engineering, Marketing and Regulatory Affairs. According to the Company's public filings, Defendant Muhsin received $3,838,314 in 2022 in compensation from the Company. As of March 31, 2023, Defendant Muhsin beneficially owned 163,787 shares of Company stock, worth $30,225,252. Defendant Muhsin was named as a defendant in the Securities Class Action.

27.     Defendant Eli Kammerman ("Kammerman") has served as Vice President, Business Development and Investor Relations since 2009.

***Relevant Non-Parties***

28.     This action is based on Plaintiff's review, by counsel, of an extensive record of public documents as well as the Amended Class Action Complaint (the "Amended Complaint") in the Securities Class Action which contains detailed allegations based on interviews with former employees of Masimo and/or Legacy Sound United (referred to herein as FEs 1-16) who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in that case. These former employees provided information on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

29.     FE 1 worked at Masimo between September 2022 and March 2023, initially as a Ventilation Sales Specialist before transitioning to Sales Specialist, Therapies after the FDA barred the Company from marketing the softFlow as a ventilation device. FE 1 was hired to sell Masimo's softFlow ventilation system, referred to interchangeably as a "Nasal High Flow system" or "High Flow oxygen system."

30.     FE 2 worked in Sales Management at all relevant times, selling

healthcare products to hospitals.

31.     FE 3 was contracted by Masimo to sell the Company's SafetyNet Alert to pharmacies in Ontario between November 2022 and July 2023.

32.     FE 4 served as a Remote Patient Monitoring Specialist at Masimo between December 2020 and June 2022, selling the Company's remote patient monitoring platform to hospitals.

33.     FE 5 served as a Remote Patient Monitoring Specialist at Masimo between June 2022 and February 2023, selling remote monitoring devices to hospitals in Florida. FE 5 explained that the Company sold various sensors, including pulse, temperature, and sensors that monitored other vital bodily information for patients transferring from hospital to home.

34.     FE 6 served as a Territory Manager for Alternate Care, Great Lakes West at Masimo between June 2011 and April 2023, selling medical devises in Kentucky, Ohio, and Indiana. FE 6 explained that while the Acute Care division of the Company sold to hospitals, the Alternate Care segment sold medical devices to home care, long-term care facilities, and WIC (Women Infant Children) facilities.

35.     FE 7 served as a Clinical Sales Specialist at Masimo between June 2022 and January 2023, supporting sales teams throughout the eastern half of the United States, with a territory stretching from Houston, Texas to Boston, Massachusetts.

36.     FE 8 served as an Account Manager at Masimo between April 2022 and December 2022. His responsibilities included sales of patient monitoring equipment in New Mexico, Texas, and Arizona hospitals.

37.     FE 9 served as a Senior Hospital Automation and Monitoring Specialist at Masimo between October 2021 and January 2023, selling non-invasive and continuous patient monitoring services in the Company's acute care segment.

38.     FE 10 was contracted by Masimo to sell the Bridge, an opioid withdrawal device, in Florida between July 2022 and February 2023.

39.     FE 11 served as an Account Manager from prior to the start of the

Relevant Period until late 2022, selling patient monitoring products to hospitals.

40.     FE 12 served as a Clinical Account Executive at Masimo between April 2022 and October 2022, selling patient monitoring devices to hospitals in Nova Scotia, New Brunswick, Newfoundland, and Prince Edward Island.

41.     FE 13 served as Vice President of Information Systems at Masimo between February 2022 and March 2023, overseeing implementation of a new Enterprise Resource Planning ("ERP") system at the Company's headquarters and reporting directly to Defendant Young.

42.     FE 14 served as Vice President & Global Controller at Sound United from September 2021 until August 2023. FE 14 explained that, after Masimo's acquisition of Sound United, FE 14 initially reported directly to Defendant Young, but at some point he began reporting to Paul Hataishi, Masimo's Chief Accounting Officer ("CAO").

43.     FE 15 served as the Vice President of Finance Transformation and Risk at Sound United between July 2022 and August 2023, overseeing the implementation of internal controls at Sound United. FE 15 recalled working to remediate known material internal control deficiencies at Sound United, Masimo's non-healthcare segment.

44.     FE 16 served initially as a Staff Accountant at Sound United in December 2018 before being promoted to Senior Accountant in June 2022. FE 16 left the Company in July 2023.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

45.     By reason of their positions as officers and/or directors of Masimo, and because of their ability to control the business and corporate affairs of Masimo, the Individual Defendants owed Masimo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Masimo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best

interests of Masimo and its shareholders so as to benefit all shareholders equally.

46.    Each director and officer of the Company owes to Masimo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

47.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Masimo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

48.    To discharge their duties, the officers and directors of Masimo were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

49.    Each Masimo Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Masimo, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

50.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

51.    To discharge their duties, the officers and directors of Masimo were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Masimo were required to, among other things:

> (a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Masimo's own Code of Business Conduct & Ethics (the "Code of Conduct");

> (b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

> (c) remain informed as to how Masimo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

> (d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Masimo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Masimo's operations would comply with all applicable laws and Masimo's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

52.    Each of the Individual Defendants further owed to Masimo and the shareholders the duty of loyalty requiring that each favor Masimo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

53.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Masimo and were at all times acting within the course and scope of such agency.

54.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public

statements issued by Masimo.

## MASIMO'S CODE OF BUSINESS CONDUCT AND ETHICS

55.    Masimo's Code of Business Conduct and Ethics (the "Code of Conduct") begins with a commitment to "maintaining the highest standards of business conduct and ethics."

56.    The Code of Conduct applies to "all employees, directors, officers and anyone conducting business on Masimo's behalf, such as distributors, sales agents and other third party representatives of Masimo worldwide," and violations of the code may result in disciplinary action, ranging "from a warning or reprimand to termination of employment or other relationship with Masimo and, in appropriate cases, civil legal action or referral for regulatory or criminal prosecution."

57.    In a section titled "**Honest and Ethical Conduct**," the Code of Conduct states:

> It is the policy of Masimo to promote high standards of integrity by conducting Masimo's affairs in an honest and ethical manner. The integrity and reputation of Masimo depends on the honesty, fairness and integrity brought to the job by each person associated with Masimo. Unyielding personal integrity is the foundation of corporate integrity.

58.    In a section titled "**Legal Compliance**," the Code of Conduct states, in pertinent part:

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Masimo's success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. Masimo expects employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility.
>
> * * *
>
> Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well

as Masimo, to civil and/or criminal penalties.

59.   In a section titled "**Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting**," the Code of Conduct states, in pertinent part:

> The integrity of Masimo's records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to Masimo's books of account. Therefore, Masimo's corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Masimo's records serve as a basis for managing its business and are important in meeting its obligations to customers, suppliers, creditors, employees and others with whom Masimo does business. As a result, it is important that Masimo's books, records and accounts accurately and fairly reflect, in reasonable detail, Masimo's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. Masimo requires that:
>
> - no entry be made or omitted in Masimo's books and records that intentionally hides or disguises the nature of any transaction or of any of Masimo's liabilities, or misclassifies any transactions as to accounts or accounting periods;
>
> - transactions be supported by appropriate documentation;
>
> - the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in Masimo's books and records;
>
> - employees comply with Masimo's system of internal controls; and
>
> - no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.
>
> Masimo's accounting records are also relied upon to produce reports

for its management, stockholders and creditors, as well as governmental agencies. In particular, Masimo relies upon its accounting and other business and corporate records in preparing periodic and current reports that it files with the Securities and Exchange Commission (the "SEC"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present Masimo's financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that Masimo's financial disclosure is accurate and transparent and that Masimo's reports contain all of the information about Masimo that would be important to enable stockholders and potential investors to assess the soundness and risks of Masimo's business and finances and the quality and integrity of Masimo's accounting and disclosures. In addition:

- ***no employee may take or authorize any action that would cause Masimo's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;***

- all employees must cooperate fully with Masimo's accounting department, as well as Masimo's Internal Auditor, independent registered public accounting firm, and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that Masimo's books and records, as well as Masimo's reports filed with the SEC, are accurate and complete; and

- ***no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of Masimo's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of Masimo's reports accurate in all material respects.[2]***

---

[2] Unless indicated otherwise, all emphasis in this Complaint is added.

## MASIMO'S AUDIT COMMITTEE CHARTER

60.     Pursuant to Masimo's Audit Committee Charter, the purpose of the Audit Committee is to:

- Oversee the Company's accounting and financial reporting processes, including the Company's disclosure controls and procedures and system of internal controls and audits of the Company's consolidated financial statements.
- Oversee the Company's relationship with its independent auditors, including appointing or changing the Company's auditors and ensuring the auditors' independence.
- Review any reports or other disclosures required by the applicable rules and regulations of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement and periodic reports within the scope of authority outlined herein.
- Oversee the performance of the Company's internal audit function.
- Provide oversight regarding significant financial matters, as well as assist in connection with the Company's legal, regulatory and ethical compliance programs pertaining to financial, accounting and tax matters as established by management and the Board of Directors (the "Board").
- Provide oversight regarding the Company's policies with respect to risk assessment and risk management pertaining to the financial, accounting and tax matters of the Company.

61.     In a subsection titled "*Quarterly and Annual Financial Statements*," the Audit Committee Charter states:

The Committee will review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditors, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and any items appropriate or required to be discussed in accordance with applicable PCAOB standards in connection with the preparation of financial statements of the Company. The Committee will be responsible for making a recommendation to the Board as to whether the Company's annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

62.    In a subsection titled "*Earnings Announcements*," the Audit Committee Charter states that the Audit Committee shall "review and discuss with management and the independent auditors, as appropriate, the Company's quarterly earnings announcements and other public announcements regarding the Company's results of operations."

63.    The Audit Committee Charter further tasks the Audit Committee with the following responsibilities:

13.    *Internal Audit Functions; Audit Plan.* The Committee will evaluate the performance, responsibilities, budget and staffing of the Company's internal audit function and review the internal audit plan, including review of any process of appointment and/or replacement of the senior employee(s) in charge of the internal audit function.

14.    *Internal Controls*. The Committee will discuss with management and the independent auditors the design, implementation, adequacy and effectiveness of the Company's accounting and financial reporting processes and systems of internal control (including any significant deficiencies and material weaknesses identified in their design or operation), the adequacy and effectiveness of the Company's information and cybersecurity policies and the internal controls regarding information security. The Committee will also oversee management risks relating to data privacy, technology and information security, including cybersecurity and back-up of information systems, and the steps taken to monitor and control such exposures. The Committee will also meet separately with the independent auditors, with and without management present, to discuss the results of their examinations.

15.    *Risk Assessment and Management.* The Committee will assist the Board in overseeing the risk management of the Company, and to review and discuss with management and the independent auditors, as appropriate, guidelines and policies with respect to financial risk management and assessment, and other risks as the Committee deems necessary or appropriate from time to time, including competition, pricing, regulation, intellectual property, technology and facilities

obsolescence, natural and man-made disasters and industrial espionage.

## SUBSTANTIVE ALLEGATIONS

*Background*

64.     Masimo is a global medical technology company incorporated in Delaware and based in Irvine, California that manufactures and sells non-invasive health monitoring solutions.

65.     Prior to 2022, the Company exclusively sold healthcare products. Its flagship product is its oximeter, which uses the Company's signature Signal Extraction Technology ("SET") to monitor health information by attaching to a patient's fingertip.

66.     The Company sells its technology to hospitals, physicians, emergency medical providers, home care providers, veterinarians, long-term care facilities, and consumers through its direct sales force, distributors, and original equipment manufacturer partners.

67.     In February 2022, the Company entered into an agreement to purchase Sound United, a consumer audio equipment company that produced and sold, *inter alia*, loudspeakers, sound bars, AV receivers, amplifiers, turntables, and headphones. On April 12, 2022, Masimo completed its acquisition of Sound United in an all-cash deal for $1.025 billion, representing the largest deal in Masimo's history. In a press release issued on February 15, 2022, Defendant Kiani touted Sound United's "commitment to providing innovative, best-in-class products and experiences, with a relentless focus on improving the consumer experience."

68.     Masimo and Legacy Sound United employees, however, expressed confusion and concern regarding the acquisition. According to FEs 14 and 15, employees of both companies failed to understand the purpose of the acquisition and considered it a "strange marriage." FE 6 similarly recalled Masimo employees wondering why the Company would spend $1 billion to acquire a company that diverged so far from Masimo's core brand.

69.     FE 14 stated that Scott St. Clair, CFO of Legacy Sound United mentioned that selling Sound United was a "fire sale" because the Sound United brand was on the decline, and he "failed to understand" Masimo's strategy in acquiring Sound United.

70.     According to FE 15, Defendant Kiani was told internally "multiple times" during due diligence on the acquisition that Masimo should not go forward with the deal. FE 14 similarly recalled being told by Dennis Batin, Masimo's Senior Director, Accounting, that an outside consultant, who FE 14 believes was McKinsey & Company, advised Defendant Kiani regarding the acquisition: "Don't do this," but Batin told FE 14 that "Kiani wanted to do it."

71.     Investors were similarly confused by the acquisition, and the announcement of the deal caused the Company's stock price to decline dramatically, wiping out $5.1 billion of Masimo's market capitalization. Indeed, in October 2022, in the wake of the announcement, one investor, Politan Capital Management ("Politan") filed suit in the Delaware Chancery Court against the Company, Defendant Kiani, and Defendant Young, alleging breach of fiduciary duties (the "Politan Action"). According to the Third Verified Complaint filed in the Politan Action:

> Long-simmering stockholder discontent with the Board's inaction in the face of serious corporate governance failures finally boiled over when Masimo announced that it was acquiring Sound United—a consumer audio company that sells speakers and headphones under brands such as Bowers & Wilkins, Denon, and Polk Audio—for approximately $1.025 billion. The Sound United acquisition, which represented a departure by Masimo from its core pulse oximetry business into unrelated consumer audio products, was the final straw for many of Masimo's stockholders.[3]

---

[3] *Politan Cap. Mgmt. LP v. Kiani et al.,* Case No. 2022-0948-NAC (Del. Ch. Aug. 7, 2023), ¶ 89.

72.    The Politan Action alleged that, "based on extensive research, never before in the history of United States publicly traded companies has an acquiring company's market cap declined by more than *two* times, let alone *five* times the purchase price of the acquisition where the acquisition was material (*i.e.* 5% or more of the acquiring company's market cap."[4]

***Following the Acquisition, Sound United's Sizeable Inventory Grew as Its Sales Stagnated Under Masimo's Ownership***

73.    According to Masimo's Form 10-Q for the second quarter of 2022, at the time of the acquisition in April 2022, Sound United held inventory worth $230.7 million, more than half of Masimo's consolidated inventory of $449.2 million.

74.    In the five quarters preceding the acquisition, Masimo maintained relatively consistent inventory levels between $201 million and $216 million. In contrast, following the acquisition, the Company's inventory levels soared from $449.2 million at the time of the acquisition to $585 million by September 30, 2023. Over this same period, as alleged herein, Masimo's sales declined significantly.

75.    As a result, Masimo's cash flow became tied up with the Company's inventory investment, causing its cash position to decline dramatically, from $550 million prior to the acquisition to $218 million immediately following the acquisition. Masimo's cash position continued to decline throughout the Relevant Period, hitting $124 million at the end of the third quarter of 2023.

///
///
///
///

---

[4] *Id.* at ¶ 91.

76.     Moreover, Sound United's stagnating sales resulted in inventory levels that, by the third quarter of 2023, exceeded quarterly revenue:



77.     Masimo initially maintained that it was intentionally accumulating inventory to address supply chain challenges related to the COVID-19 pandemic. However, by 2023, Sound United's sales under Masimo's ownership began to decline significantly, with quarterly sales falling 35% from $265 million in the fourth quarter of 2022 to just $171 million in the third quarter of 2023. As a result of Sound United's declining sales, in conjunction with its rising inventory levels, Masimo has faced an aging inventory at risk of obsolescence.



78.     According to former employees, when inventories reached their peak, Company executives called for a 10% increase to the 2023 sales forecast without any justification. This increased forecast was maintained despite the inevitability of sales declines as COVID-19-related consumer purchasing patterns subsided.

***The Company's Materially Deficient Internal Controls Over Financial Reporting and Disclosure Control Procedures***

79.     Prior to the acquisition, Sound United had several material deficiencies that were undisclosed throughout the Relevant Period including: (i) lack of segregation of duties ("SODs"); (ii) an inability to use automated accounting systems, requiring the use of spreadsheets to report financial information; (iii) a failure to perform account reconciliations leading to inaccurate account balances; (iv) a procurement process without a control, such as the use of purchase orders; and (v) a lack of controls over access to information technology systems. Importantly, Masimo refused to authorize Sound United's personnel responsible for internal controls over financial reporting to implement the necessary changes to remedy these significant deficiencies.

80.     Several former employees confirmed that Sound United was plagued by ineffective internal controls and a culture of fraudulent practices. As detailed in the Securities Class Action, internal documents indicated that the Company had experienced these issues throughout the Relevant Period, including a February 2023 PowerPoint slide deck titled "Global Accounting Concerns," which detailed several deficiencies in Sound United's internal controls, particularly with respect to its accounting for inventory and cost of goods sold. Specifically, Sound United lacked internal controls over its process of setting inventory standard costs. As a result, Sound United used inflated inventory standard costs, causing the Company to overstate the value of products in inventory and understate expenses during 2022. When Sound United discovered the issue in 2023, it was forced to recognize the

higher-costed inventory as a cost of revenue.



81.     Second, Sound United lacked effective internal controls over the identification of inventory that had been sold to customers. As a result, when a sale was recorded, Sound United would fail to record the proper cost of the sale, and Sound United therefore lacked reliable information regarding its inventory levels on any given day. Importantly, Sound United failed to conduct a physical inventory to evaluate whether the inventory it reported was reliable.

82.     Third, Sound United lacked an inventory obsolescence policy. FE recalled proposing such a policy, but it was "killed." Without such a policy, Sound United failed to accurately evaluate its inventory levels. For instance, Sound United held a substantial amount of obsolete and unsellable Turkish Airlines headphones that warranted recognition of an impairment charge, but it lacked the ability to measure the expected loss on the inventory.

83.     Fourth, Sound United was forced to use "plug" entries to balance its accounting records. Sound United's monthly "plug" entries were recorded in amounts up to $9 million—significantly exceeding the Sound United financial statement materiality threshold of $2 million. These "plug" entries improperly

increased Sound United's reported gross profits by reducing cost of goods sold.

84.    FE 14 explained that the "plug" entries were typically recorded as a credit to Cost of Goods Sold (COGS) and a debit to inventory. FE 14 characterized the adjustments as "11th hour topside entries," always occurring one or two days before financial information had to be finalized.

85.    As a result of these deficiencies, there was a significant likelihood of Sound United's financial statements, and in turn, Masimo's financial statements, being materially misstated, and Masimo lacked personnel with sufficient experience in accounting and internal controls to remediate the material weaknesses.

86.    FE 14 confirmed that Sound United's internal controls over financial reporting were completely deficient at the time he was hired. FE 14, who was hired specifically because of his experience with controls over financial reporting for publicly traded companies, stated that Sound United had "no accountants with public experience." FE 14 further recalled key accounting personnel from Sound United that joined Masimo after the acquisition had quit by the end of 2022.

87.    FE 14 explained that an audit of Sound United conducted by BDO around the time that he joined identified at least five material deficiencies at Sound United including: (i) a lack of SODs; (ii) a lack of sufficient formalized processes and procedures; (iii) a lack of review of journal entries related to the OneStream system; (iv) inadequate review of material contracts; and (v) a lack of information technology controls. FE 14 characterized Sound United's accounting department as "broken across the board." With respect to these five material deficiencies identified in the 2021 BDO audit, FE 14 stated that he was unable to remedy the issues prior to his departure in August 2023. FE 15 similarly explained that he lacked authority and "teeth" to strengthen Sound United's internal controls. FE 15 stated that he brought the internal controls issues to the attention of Defendant Young on several occasions, but he was consistently ignored.

88.    FE 14 stated that while Sound United had implemented the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 23 -

consolidation software OneStream prior to him joining, they still used Excel spreadsheets in lieu of any specialty accounting software. FE 14 described Sound United's use of Excel spreadsheets for accounting as "crazy." Further, FE 14 recalled Defendant Young ignoring advice from both MorgranFranklin consultants and OneStream consultants to rebuild the Company's consolidation software. Instead, Defendant Young hired Damon Gangi ("Gangi"), who had previously worked for Masimo, to serve as Vice President, Financial Systems despite Gangi's utter lack of experience with the OneStream platform. According to FEs 14 and 15, despite the requirement that Gangi's changes to OneStream were to be vetted, he frequently made changes to the platform without any approval by a corporate controller. In one instance, FE 14 recalled asking a colleague why his margin numbers had changed, and the colleague responded that Damon Gangi made the changes to his margin numbers. As detailed in the Securities Class Action, internal Company emails confirmed that changes being made to the platform were not adequately monitored in Masimo's systems.

89.    With respect to the Company's lack of SODs, the Securities Class Action further details internal emails between members of Masimo's accounting team that revealed that Deloitte consultants had identified nearly twenty design gaps in Sound United's accounting systems related to insufficient SODs as of June 29, 2023. SODs are important to ensure that no single employee has the ability to both perpetrate and conceal errors in the normal course of their duties. As detailed in the Securities Class Action, internal Masimo emails revealed that more than 40 employees had made journal entries for Sound United in 2022 who were not listed as employees with authorization to do so.

90.    FE 14 further explained that Naseem Ansari, Sound United's CFO of the Americas, could open and close accounting periods at will and, in some instances, made entries in excess of $100 million with no review or approval.

91.    FE 15 stated that everyone in Sound United's Finance department—

from the CFO to the accounts payable entry clerks—could create journal entries in Masimo's accounting system, which he characterized as a significant internal controls deficiency. FE 15 further explained that the accounting department in the Company's non-healthcare segment (*i.e.* Sound United) was understaffed with inexperienced and unqualified employees.

92.    FE 14 additionally recalled Sound United utilizing four difference ERP systems which were not interconnected, rendering it difficult to monitor sales and costs across the business.

93.    FE 14 stated that, as a result of Sound United's fraudulent accounting practices and deficient internal controls, Sound United closed the books at the end of 2022 with $177 million of unknown assets.

94.    FE 14 further explained that "capitalization methodology" at Masimo was "not existent or not followed" and that inventory values were "manipulated." For example, FE 14 recalled an instance in which legacy Sound United held $1 million worth of headphones that they did not think they could sell but did not write off in a timely fashion. FE 14 further recalled an instance in which Defendant Young created a misleading model of capitalization which resulted in excess capitalization of $4 million for the quarter for the sole purpose of increasing profit for the quarter. FE 14 added that Sound United used foreign exchange accounts to make capitalization on inventory numbers "what they wanted them to be."

95.    As another example of a controls issue impacting the Company, Sound United Japan was characterized by FE 14 as "a problem from day 1."

96.    FE 15 explained that he and FE 14 were instructed in September 2022 by Defendant Young to visit Sound United's Japan affiliate, as employees in Japan were opening and closing accounts without permission. However, after this instruction, FEs 14 and 15 were informed by CAO Paul Hataishi ("Hataishi") that there was a corporate travel ban, and they were therefore unable to travel to Japan. FE 14 suggested that Defendant Young changed his mind to conceal any wrongdoing

in Masimo's non-healthcare segment accounting.

97.     FE 14 added that there was no cash strategy at Sound United Japan, there was no cash forecast based on accounts receivable or commitments, and there was "willy nilly" spending with no visibility as there was no requirement to have a purchase order before many purchases.

98.     FE 14 recalled being asked to sign a sub-certification SOX representation letter in March 2023 indicating that the legacy Sound United financials were sound. When he refused to do so, raising concerns about the issues detailed herein, he was fired in retaliation.

***The Individual Defendants Fail to Integrate Sound United Following the Acquisition***

99.     In addition to the fraudulent accounting practices and deficient internal controls detailed above, the Company was also failing to integrate Sound United into Masimo. Former employees confirmed that the acquisition failed to achieve any synergies between the two companies and the two segments operated essentially as separate entities following the acquisition.

100.    FE 14 stated that he had heard Defendant Kiani wished to get into consumer markets through Sound United's distribution channels like Amazon and Best Buy, but he did not observe any synergies between the two companies while he worked at Masimo.  FE 15 similarly recalled that there was "very little" or no integration between the two companies in terms of financials and even "less so" from an IT and operations perspective.

101.    FE 15 explained that Masimo's speakers were becoming "obsolete" but that its brand would suffer" if the Company offered them at discounted rates. Meanwhile, FE 15 recalled Masimo's healthcare segment having "struggles themselves," further impacting Sound United as Masimo failed to generate the cash flow needed to integrate the two companies.

102.   Likewise, FE 16 explained that prior to the middle of 2023, there were no revenue synergies between Masimo and Sound United and they operated as independent entities.

***The Individual Defendants Set Unrealistic Budgets and Sales Targets Despite Declining Sales***

103.   FE 13 worked to implement Masimo's new global ERP system, Oracle EBS, to replace its old system, Expandable. According to FE 13, Oracle EBS and Expandable both contained all of Masimo's healthcare sales, financials, inventory data, and "SOX related data," and this data was readily accessible by the Company's senior executives, including Defendant Kiani.

104.   Despite having access to data which revealed inventory issues and declining sales, the Individual Defendants continued to push Masimo's revenue growth throughout the Relevant Period.

105.   FE 15 recalled growth forecasts being discussed during a December 2022 budget meeting for Masimo's non-healthcare segment that were simply unattainable. By the fourth quarter of 2022, Sound United's revenue was decreasing and its inventory was increasing, causing an "inventory glut," according to FE 14. FE 14 stated that, despite the already unattainable budget, Defendant Kiani increased it by an additional 10%. FE 14 recalled Defendant Kiani stating that for "every forecast" to "add 10% and make it happen," even though "they knew it couldn't happen."

106.   FE 15 recalled being told by the Company's Finance Director for the EU, Marco van Hoeck, that he, too, was "stuck" with an unattainable 10% budget increase in 2023 despite the fact that sales were projected to decrease by 10-15% in 2023.

107.   FE 14 explained that one reason why Masimo overstated its fiscal guidance was because "they came up with their budgets after COVID," and continued to project guidance based on its unsustainable pandemic-related growth rates in 2021 and 2022.

108.   FE 14 explained that Sound United's sales and budgeting processes were just as deficient as its accounting practices. FE 14 stated that, during 2023, the cash figures were "horrible on both sides" of Massimo's business and that cash and sales were down significantly in both segments, not only Masimo's consumer segment.

109.   FE 15 attended Quarterly CFO Calls hosted by Defendant Young, and he stated that the calls were unorganized. FE 15 further explained that the Company's declining sales and increasing inventory levels were discussed during these calls throughout the Relevant Period.

110.   FE 14 explained that Sound United's CFO of the Americas, Naseem Ansari, worked with Masimo's finance team based in Irvine, including Defendant Young, to establish the unattainable budgets. FE 14 explained that financial goals for 2023 were presented during the CFO call at the end of 2022. FE 14 recalled the Sound United participants on that call being "scared" of the target numbers that were presented, and several of them expressed disbelief at how unrealistic the targets were. FE 14 recalled Kiani dismissing the concerns.

111.   FE 14 stated that the Company conducted Sales & Operations meetings ("SNOPs"), which were monthly operational meetings and financial reviews, hosted by Vice President Finance Consumer, Joe Tristani and Chief Operating Officer, Consumer Division, Blair Tripodi ("Tristani" and "Tripodi"). According to FE 14, the truth with respect to the Company's financial performance was discussed in detail during the SNOP calls, but financial results were then manipulated before the figures would be publicly disclosed.

112.   FE 14 explained that, during the SNOP calls at the end of 2022, Tristani and Tripodi were asked why forecasts were being increased despite a consensus in the industry that the spike in luxury entertainment sales during the COVID-19 pandemic was not going to continue. FE 14 recalled Tristani and Tripodi responding by saying the Company would miss its target by $10 million in the current month

but "we'll make it up by the end of the year" and displaying figures and graphs without any context or justification.

***Masimo's Healthcare Business Experiences Declining Sales***

113.    Former employees explained that customer preferences began shifting away from single-use sensors, and the Company struggled to sell products outside of its core SET pulse oximetry business.

114.    FE 3 stated that he failed to sell any Masimo SafetyNet Alerts during his time with the Company, and he characterized the device as a "complete bust," stating that the product was overpriced, and it did not work "all that well." FE 3 explained that Masimo only sold 12 SafetyNet Alerts in Canada while he worked for the Company.

115.    FE 7 recalled the Company's east coast sales team being given "lofty" goals that they consistently failed to meet because "not one" product was sold in his territory while he worked at Masimo. FE 7 stated that he was tasked with selling the (i) LiDCO Hemodynamic Monitoring System, (ii) oxygen delivery cables, (iii) hemoglobin sensors, and (iv) SedLine brain functioning monitor.

116.    FE 7 explained that LiDCO stood for (Li)thium (D)ilution of (C)arbon (O)utput, and it was used for measuring cardiac output. FE 7 recalled doctors telling him that it "didn't work" and was "too much work" to use and dismissing it as "just a numbers generator" that they were not interested in buying because they did not trust it.

117.    Likewise, FE 10 stated that he failed to sell any Bridge devices while working at Masimo and that only one sales person located in Georgia was able to make sales, though he "did not sell many."

118.    FE 5 described his tenure at Masimo as the worst work experience he had ever had and explained that his sales team consistently failed to meet their goals. FE 5 recalled his sales team providing forecasts to Vice President Christopher Puyear ("Puyear") who would in turn report to a President at Masimo. FE 5

explained that the forecasts that Puyear would provide were "inflated" and "180-degree different" from those provided by the sales team. FE 5 stated that internally, sensor sales were viewed at Masimo as an expected growth driver for the Company.

119.   FE 8 stated that sales declined while he worked at Masimo, including sensor sales. FE 8 explained that as the COVID-19 pandemic was winding down, there was less of a need for patient monitoring in hospitals. Further, FE 8 explained that hospitals, strapped for cash, were opting to reprocess their existing sensors from other Companies, rather than repurchase single-use sensors from Masimo.

120.   FE 2 explained that, during quarterly sales calls, at which President Matthew Anacone and several Vice Presidents were present, teams would be instructed to "pull from our upside" even if that team had met its sales projections to make up for the shortfall from other teams. FE 2 explained that pulling from the team's upside referred to offering new contracts to customers to take orders early and providing incentives including offering a month's worth of free product, rendering it difficult to meet projections in the following month.

121.   FE 2 explained that, while hospitals were opting to use single-use sensors during the COVID-19 pandemic to curb the spread of the disease, hospitals began going back to purchasing reusable sensors once the healthcare community gained a better understanding of COVID-19. FE 2 recalled the widespread switch to reusable sensors having a substantial impact on his revenue streams. Exacerbating the issue, according to FE 2, was that the Company had been maintaining excess inventory of its reusable sensors and other products to compensate for supply chain disruptions experienced during the COVID-19 pandemic.

122.   FE 1 recalled attending regular sales calls led by the Vice President of Sales, Therapy, Gary Cherry, at which a lack of sales of softFlow systems across the country was frequently discussed. According to FE 1, Masimo had failed to secure FDA approval for the use of softFlow on pediatric, infant, and tracheostomy patients, and hospitals preferred systems that were approved for use for all patients.

123.   FE 1 stated that around the time the FDA required Masimo to stop marketing softFlow as a ventilation system, he and his colleagues were directed to transition into sales of capnography products despite the fact that they were specifically recruited to sell ventilation systems due to their backgrounds in respiratory healthcare and their contacts in that field.

124.   FE 4 stated that, while Masimo set "ambitious sales goals" for its sales of remote patient monitoring products, no one "came close" to these targets. FE 4 further explained that, despite the targets not being met, Masimo would raise the targets by roughly 400% each year. FE 4 stated that another factor that was contributing to the Company's declining sensor sales was that hospitals had bought an excess number of sensors during the COVID-19 pandemic to meet the high demand. FE 9 similarly recalled a "significant" decline in sales by the fourth quarter of 2022, including in sales of sensors.

125.   FE 6 recalled a directive in the fall of 2020 to start transitioning into selling five-year device contracts. FE 6 explained that his sales team struggled to sell these long-term contracts as healthcare facilities did not want to be locked into long commitments, knowing that medical technology is constantly improving. FE 6 stated that the transition to long-term contracts had a "significant" negative impact on his team's revenues.

126.   FE 11 corroborated the accounts of the other former employees, recalling being given "high" and often "unachievable" sales targets. FE 11 explained that once sales declined, his supervisors advised his sales team to transition into selling wearable technology for opioid withdrawal.

127.   FE 12 recalled single-use sensor sales declining "substantially" in his territories and described a culture at the Company in which salespeople were expected to work "24/7."

128.   FE 2 stated that, in response to declining sales, President Matthew Anacone directed his sales team to start offering discounts. FE 2 stated that

leadership was aware that the new contracts would render it harder to meet goals in future fiscal periods. For instance, FE 2 was told to incentivize customers to take their next order three months early by offering additional free sensors.

129.   FE 2 recalled quarterly calls at which Defendants Kiani, Young, and Muhsin were sometimes present. FE 2 explained that at these meetings, sales teams were given the directives to engage customers to accept orders early. FE 2 specifically recalled a quarterly call in June 2023 at which President Matthew Anacone responded to concerns that the contracts were taking away from future revenue by saying: "We are aware of this but for now you need to concentrate on the current."

130.   FE 11 similarly recalled the Company providing discounts to hospitals if they purchased a certain amount of single use sensors or converted all of their equipment to Masimo equipment.

**The Individual Defendants' False and Misleading Statements**

131.   Throughout the Relevant period, the Individual Defendants issued materially false and misleading statements regarding the success of Masimo's healthcare business and the poor performance of Sound United.

132.   In the Company's Earnings Release for the first quarter of 2022, filed on May 3, 2022 on Form 8-K with the SEC, Defendant Kiani stated: "We experienced strong demand for our products during the quarter while facing some unexpected supply chain challenges." Defendant Kiani continued, stating that Masimo is "deeply engaged in combined efforts [with Sound United] to generate some exciting new products launches in consumer health & wellness."

133.   Also on May 3, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of 2022. That filing, signed by Defendants Kiani and Young, stated:

> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed under the Securities Exchange Act of 1934, as amended (the Exchange

Act), is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's (SEC) regulations, rules and forms and that such information is accumulated and communicated to our management, including our CEO and Chief Financial Officer (CFO), as appropriate, to allow for timely decisions regarding required disclosure.

134.   During the related earnings call held the same day, Defendant Kiani indicated that the Company's performance was an "anomaly" due to supply chain disruptions. Specifically, Defendant Kiani stated: "This quarter was an anomaly from the perspective of reported revenue and earnings due to supply chain problems." Defendant Young similarly stated: "Our results were adversely affected by certain supply chain issues, which we have addressed. ***Had this not occurred, we would have exceeded our revenue and earnings expectations for the quarter due to continued strong customer demand.***"

135.   Defendant Kiani continued during the earnings call, touting the purported upcoming benefits of the acquisition with Sound United: "[In] 2022, ***Sound United should continue to benefit from the growth of high-resolution audio streams*** that should drive adoption of premium home entertainment systems which can process it."

136.   During the same earnings call, in response to a question about the Company's revenue forecasts, Defendant Young stated: "[W]e're assuming high-single digit growth for the full year."

137.   Also during the earnings call, with respect to the Company's integration plan with Sound United, Defendant Kiani stated:

> Bottom line is we have bought Sound United for several reasons. I think I articulated that during our prepared remarks. One of them is their management team and their ability to think through consumer sales, advertisement, logistics.
>
> * * *
>
> So a big reason for this acquisition is our conclusion that we have some

really incredible products coming out without an incredible distribution channel and team. And as we tried over the last few years as we were preparing for the launch of W1 and other products, we try to build that up organically. We had not succeeded to the level that we thought would fulfill our plans. So they are our plan. And we have additionally things we're brainstorming with them, but that's really the plan.

138. Lastly, when an analyst from Wolfe Research, LLC asked the Individual Defendants if they were surprised by the market's negative response to the acquisition as "the market [voted] by reducing your enterprise value by $6 billion or $7 billion, [] an alarmingly high spread," Defendant Kiani stated:

> Yes. It definitely surprised me. *I couldn't have imagined the way some of the investors reacted* because, look, I don't know why people want to invest in Masimo or why they don't. But if people got out because of the Sound United, that was really a bad decision because Sound United helps our plans for the future. And we didn't mortgage much to gain that assurance for our future.
>
> So yes -- no, *the investors' reaction is a big surprise*, but it doesn't at all, not at all, change our thinking about the reason we did it and our conclusion that this was a great acquisition. As of this point, we told you before, if things don't work out, you make decisions, you go forward, but sometimes, you can be wrong. If it doesn't work out, we'll let you know. But this is really at this point what we think is the best thing we could have done.

139. The Individual Defendants statements identified above in ¶¶ 132-138 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company was not experiencing "strong demand" and in fact, Masimo was forced to offer sizeable discounts to account for the weak demand environment; (ii) the Company had begun offering long-term contracts that deterred healthcare facilities from purchasing Masimo's products; (iii) Masimo's healthcare business was struggling to make sales outside of its core SET pulse oximetry products in part because Masimo failed to secure FDA approval for the use of its products on all

patient populations; (iv) the Individual Defendants lacked any integration plan and as a result, Masimo and Legacy Sound United continued to operate as essentially separate entities and failed to achieve synergies throughout the Relevant Period; (v) it should not have come as a "surprise" to Defendant Kiani that the market reacted negatively to the acquisition considering he was advised both internally and by numerous consultants not to go through with the deal; (vi) as demand was declining, the Company's inventory levels were rising, heightening the risk of product obsolescence; (vii) the Individual Defendants failed to address rampant materially deficient internal controls throughout the Relevant Period; and (viii) as a result of the foregoing, the Individual Defendants positive statements regarding the Company's business, operations, and prospects were materially false and misleading and the Individual Defendants financial forecasts were materially overstated.

140.   On August 9, 2022, Masimo announced financial results for the second quarter of 2022. In the Company's earnings release, issued that day, the Company touted its purported "85.3% reported growth compared to [the second quarter of 2021]." Defendant Kiani was quoted in that earnings release as stating:

> We delivered strong performance in the second quarter with revenue and ***earnings exceeding the high end of our guidance range***. Our healthcare business fulfilled most of the delayed shipments from the first quarter by increasing manufacturing output, which boosted our growth in the second quarter. ***As a result, our healthcare business delivered 11% constant currency revenue growth for the first half of the year***. We are raising our financial guidance on a constant currency basis for fiscal year 2022. I'm excited about the expanded potential to address new markets with our recently acquired consumer business, which will advance solutions for our customers at hospitals and at home.

141.   The earning release also announced financial guidance for the third quarter of 2022 that was materially overstated and wholly unrealistic, including guidance for Sound United in the range of $195 million to $215 million for the third quarter and $655 million to $700 million for the full year 2022.

142.    During the Company's earnings call for the second quarter of 2022, Defendant Kiani stated, with respect to Sound United, that "[t]he new business performed very well in the quarter, with sales exceeding expectations." Defendant Young added:

> For our consumer non-healthcare segment, second quarter revenues were $208 million from April 11, 2022, through fiscal quarter end. On a pro forma basis, for the full quarter, our consumer non-healthcare revenues would have been $215 million, representing 4% reported growth and 10% constant currency growth. This business had solid growth across all regions and categories led by the premium brands of [Denon], Marantz and Bowers & Wilkins. ***The combination of strong demand with effective management of supply chain challenges produced better-than-expected sales performance during the quarter.***

143.    During the earnings call, in response to an analyst question regarding the driver of the Company's positive third quarter and full year guidance, Defendant Kiani stated that the third quarter "has historically been the lightest quarter" for healthcare because patients have fewer "elective procedures in the summertime." Defendant Kiani continued, stating that "on the consumer side, a lot of business gets done in the holiday season in Q4. And so I think they're kind of in the same boat. So we don't—there is nothing that we're alarmed about." Defendant Young reiterated Defendant Kiani's statements, explaining: "[T]o Joe's point, the strongest quarter for the consumer, our now non-healthcare segment, is of course the fourth quarter. . . And there's a lot of investment that goes into the business throughout the year preparing for that fourth quarter."

144.    In addition to the reasons set forth in ¶ 139, the Individual Defendants' statements identified in ¶¶ 140-143 were materially false and misleading and omitted to state material facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company's financial results and guidance were materially overstated; (ii) the Company's results were not attributable to "effective management of supply chain challenges" but rather to materially deficient internal

controls and the fraudulent use of "plug" entries to balance the Company's accounting records.

145.   The Company's quarterly report for the second quarter of 2022, filed on Form 10-Q on August 10, 2022, included the same materially false and misleading statement regarding the Company's internal controls that was contained in the Company's quarterly report for the first quarter of 2022, as discussed in ¶ 133.

146.   On November 8, 2022, the Company announced its financial results for the third quarter of 2022 in an earnings release and earnings call. Masimo's press release, filed with the SEC on Form 8-K, quoted Defendant Kiani as stating: "Our healthcare segment achieved double digit constant currency growth and *our consumer non-healthcare segment reported another quarter of better-than-expected results. Our performance in the third quarter was achieved in a challenging environment and made possible by commendable contributions from our entire team.*"

147.   During the related earnings call, Defendant Young stated:

We delivered strong results in the third quarter with revenues, operating margin and earnings per share exceeding the high end of our guidance range. Our consolidated revenue was $549 million, representing 3% reported growth and 8% constant currency growth on a pro forma basis.

148.   With respect to Sound United, Defendant Young stated:

For our consumer nonhealthcare segment, third quarter revenues were $222 million, decreasing 2% on a pro forma reported basis but increasing 5% on a pro forma constant currency basis.

As I mentioned on our last earnings call, this business faced its toughest year-over-year comparison due to an exceptionally strong third quarter of 2021, which was above trend line due to the fulfillment of back[-ordered] products. *Despite the difficult year-over-year comparison, this business delivered solid growth due to strong performance by our premium Bowers & Wilkins and Marantz brands.*

149.   The following day, on November 9, 2022, the Company filed its

quarterly report on Form 10-Q with the SEC for the third quarter of 2022. That filing, signed by Defendants Kiani and Young, included the same materially false and misleading statement regarding the Company's internal controls that was contained in the previous two quarterly reports, as discussed in ¶¶ 133 and 145.

150.   On November 15, 2022, Defendants Young and Kammerman attended the Stifel Healthcare Conference on behalf of Masimo. At the conference, the host stated that he was confused by the Company's disclosure of foreign exchange headwinds and supply chain issues tempering its fourth quarter 2022 guidance during the November 9, 2022 earnings call, considering "both . . . business[es] perform[ed] extremely well." In response, Defendant Young stated: ***"We are being cautious right now just because there are a lot of challenges right now in the macro environment."***

151.   In reality, the Company was not facing vague challenges "in the macro environment," but was experiencing diminishing demand for its products.

152.   Later during the conference, in response to a question regarding the contract backlog in the Company's healthcare business and "the implications for [20]23," Defendant Young stated:

> Well, ***it's a good tailwind going into '23 and our outlook for next year as well as beyond*** because a lot of our contracts, as you know, those are, call it, 4-, 5-year terms as far as length . . . that backlog represents undelivered equipment under contract as well as undelivered sensors. So that will give a nice tailwind over the next 5 years [as we] start to install under those contracts and roll out the equipment.
>
> * * *
>
> We're seeing that in our contract—the new contracts, winning new customers to Masimo. We're also seeing strong renewals as well. So all those things are lining up very well for—as we move into next year.

153.   This statement was materially misleading because it failed to disclose the fact that many healthcare facilities were resistant to enter into the Company's

long-term contracts, and in reality, the transition to these contracts had been stifling Masimo's sales.

154.   Later during the conference, with respect to Masimo's integration of Sound United, Defendant Young stated:

> Right now, we've got—it's—right now, we're going through collaboration among our R&D and development teams. So those projects are underway. They're working together. A lot of those projects are 2-year-plus type contracts or projects. ***The back office, we've been integrating more to the back office. That's been driving some efficiencies there for us. We're through the majority of the integration. So we still have some systems integrations that we need to work through, but it's going very well so far.***

155.   In reality, and as discussed above, the Company failed to implement any integration plan after the acquisition, and as a result, Masimo and Sound United continued to operate as independent entities and failed to achieve any synergies throughout the Relevant Period.

156.   On December 13, 2022, Masimo hosted its 2022 Analyst/Investor Day, during which the Company's revenue guidance and the Sound United acquisition, among other things, were discussed.

157.   With respect to the acquisition, Defendant Kiani stated the following during his opening remarks:

> What we have in our hands right now is rice krispies and cornflakes. ***People keep buying them. And we just can't screw it up*** and we don't intend to. We intend to actually take it to a new level. But we couldn't have gotten that with some of the new companies that have emerged that could be gone tomorrow.
>
> ***And by buying Sound United, we now have another $1 billion business that on its own will do well despite, God forbid, what could ever happen to Masimo health care.***

158.   During the 2022 Analyst/Investor Day, Defendant Muhsin stated that "what gives Masimo SET the right to win and continue to win not only by expanding

with our installed base, but continuing to win customers from our competitors."

159.    With respect to Masimo's revenue guidance, Defendant Young reported: "[W]e're looking at $2.330 billion to $2.4 billion for next year." Defendant Young broke the revenue guidance into "$1.420 billion to $1.450 billion [from healthcare]" and "$910 million to $950 million [from consumer]."

160.    Defendant Young touted the benefits of the Sound United acquisition at the 2022 Analyst/Investor day:

> [T]he power of this acquisition is it provides immediate critical mass for what we're doing today and all the things that we're showing you today with new products, all the things we're coming out with consumer health. And also it plays a key role with our future of telemonitoring.

161.    Defendant Young continued, stating:

> [W]hat we found was a company that had all the majority of the things we were looking for, and it was a reasonable valuation, 1x revenue, 8x EBITDA, and it gave us immediately accretive earnings. And the biggest thing here for us too is it provides significant upside optionality.

162.    Defendant Young further stated the following with respect to Masimo's growth plans:

> ***[I]f you look at our plan, high-single digit growth, 7% to 9% combined, and we're going to do that through market-leading performance of our core businesses***. When you think about the consumer audio, the traditional healthcare business. And then we have a lot of upside optionality to capture. And we plan to make the right investments as we move forward and balance reinvestment within what the guidance we provided to really capture that upside optionality and hopefully drive significantly better results than what we're even targeting today. And then, of course, leverage earnings growth.
>
> If you look at our long-term outlook, we're providing 10% to 12% earnings growth. ***We're going to do that to driving gross margin improvements, continue to leverage operating expenses and balancing reinvestment to support those new product initiatives and***

*that will help us capture the upside as well as continue to deliver sustainable revenue and earnings growth as we move forward*.

163.   The Individual Defendants' statements issued at the 2022 Analyst/Investor Day were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading for the reasons set forth in ¶¶ 139 and 144.

164.   On January 11, 2023, at the J.P. Morgan Healthcare Conference, Defendant Young again touted the benefits of the Sound United acquisition:

> We looked at a lot of companies. Some were just—the financials didn't make sense. There's other areas that just wasn't strategic fit for us. ***We liked how a lot of those boxes checked down the line for Sound United.*** And again, we weren't focused on audio. We were focused on what we could do together to deliver the best product in consumer health as well as they happen to be a great fit for hearables as well, and that's a big market that we/re going after.
>
> And it would've been heavy multiyear investment, highly diluted to earnings, and we didn't want to do that. ***And it just happened to be a company that had pretty good financial metrics, and they were immediately accretive to earnings.*** And it gave us a very scalable platform and something that we can drive a lot of synergies on over the next 5 to 10 years.

165.   On February 28, 2023, the Company announced its financial results for the fourth quarter and full year 2022 in an earnings release and related earnings call. In the earnings release, Defendant Kiani stated:

> 2022 was a momentous year for Masimo. Our healthcare business outperformed expectations. We continued to innovate and deliver clinically proven new products in our professional healthcare markets. In addition, we accelerated our strategy to capture the vast consumer health market opportunity with the acquisition of Sound United and the introduction of new wearable technologies such as our W1$^{TM}$ biosensing watch. The acquisition has provided us with immediate scale across consumer engineering, sales, marketing and distribution that would have otherwise taken many years of dilutive investment to

build. ***Instead, we've already completed the integration and are working to realize the tremendous potential of the hearables, wearables and telemonitoring markets unlocked by our unique combination of healthcare and consumer technology capabilities***.

166. Despite Defendant Kiani's indication that the integration was "already completed," the Individual Defendants had failed to put in place any integration plan at all, and as a result, Masimo and Sound United continued to operate as two separate entities and failed to achieve any synergies throughout the Relevant Period.

167. Defendant Kiani reiterated this point during the related earnings call held the same day, stating "we've already completed the integration of Sound United."

168. Also during the earnings call, Defendant Young revised the Company's guidance upward, stating:

> ***For the full year 2023, we are now projecting a consolidated revenue range of $2.415 billion to $2.460 billion, representing 6% to 8% growth on a pro forma and constant currency basis***. Compared to our prior guidance, this represents an increase of $73 million at the midpoint of the range, which is comprised of an increase of $58 million due to foreign exchange improvement and an increase of $15 million due to our improved sales expectations.

169. On March 1, 2023 Masimo filed its 2022 annual report on Form 10-K with the SEC. That filing, signed by Defendants Kiani, Young, Cohen, Mikkelson, Reynolds, and Shimer, reported consolidated revenue of $2.035 billion, with $1.3403 billion from the healthcare segment and $695.5 million from Sound United. The annual report stated that "[t]he increase in healthcare segment revenue was . . . offset by the impact of unfavorable foreign exchange rate movements," and that "[t]he non-healthcare segment saw strong demand for consumer audio products, which was partially offset by the impact of unfavorable foreign exchange rate movements."

170. This statement was materially false and misleading for the reasons set

forth in ¶¶ 139 and 144.

171.   On May 9, 2023, the Company announced its financial results for the first quarter of 2023 in a press release filed with the SEC on Form 8-K and a related earnings call. The Company reported consolidated revenue of $565.0 million, which consisted of $346.7 million in healthcare revenue and $218.3 million in non-healthcare revenue.

172.   During the related earnings call, Defendant Young repeated the materially overstated revenue figures reported in the press release and added: "[O]ur healthcare business again realized steady gains in market share across the portfolio.

173.   The Company's quarterly report filed on Form 10-Q the following day contained the same materially misleading statements concerning Masimo's internal controls that was contained in the Company's previous quarterly reports, as discussed in ¶¶ 133, 145, and 149.

174.   At the June 8, 2023 Jefferies Healthcare Conference, Defendant Kammerman touted purported growth in the Company's sensor sales:

> Yes, you're right in saying that our sensor sales are tied to overall sensors in the hospitals. Our sensors are used with both surgery patients as well as medical treatment patients. And so you can see that hospital traffic is really the key variable there. Hospital traffic now has basically gotten back to trend line growth as you can see in the hospital reports coming out quarterly. ***We're looking at sensors growth in the range of 1% to 3% nowadays.***
>
> So it's made a nice recovery from the levels during COVID when people were postponing a lot of elective surgeries. ***For us, the key metric to look at for forecasting our growth is the installed base growth. And there, we're tracking very much on trend at about 7%.*** Some of the OEM monitoring companies had some hiccups with installations over the past 18 months. But a lot of those have now been addressed. They had supply chain problems themselves. So at this stage, I would say, things have gotten largely back to normal.

175.   This statement was materially false and misleading and omitted to state

material adverse facts necessary to make the statement not misleading for the reasons set forth in ¶¶ 139 and 144. Specifically, this statement was patently false because, at the time of the issuance of this statement, sales across Masimo's business, including sensor sales, had actually been declining.

***The Truth Emerges***

176.   On July 17, 2023, Masimo issued a preliminary revenue announcement in a press release filed with the SEC on Form 8-K. In the announcement, the Company lowered its full year guidance and revealed disappointing financial results:

> Masimo expects its consolidated revenue for the second quarter 2023 to range from $453 million to $457 million, with healthcare revenue expected to range from $280 million to $282 million and non-healthcare revenue expected to range from $173 million to $175 million.
>
> Though the healthcare business made significant market share gains through new contracting in the second quarter, healthcare revenue for the second quarter 2023 was lower than expected due to multiple factors, including the following:
>
> - Large orders that were anticipated for the second quarter were delayed to the second half of the year.
>
> - Single-patient use sensor sales were down due to:
>
>   - Lower than expected U.S. hospital inpatient census, which drives usage of single-patient use sensors; and
>
>   - Elevated sensor inventory levels at some customers due to discounting in prior quarters, which was discontinued during the second quarter, and the abnormally early end of the flu season, which faded quickly in the first quarter this year.
>
> - Conversions of new customers who have contracted to switch to Masimo were less than expected due to labor shortages in

hospitals, and our OEM partners not being able to provide the patient monitoring equipment needed to complete the installations in a timely manner.

- Continued increased hospital labor costs have strained hospital budgets, lowering demand for capital equipment in the second quarter.

Non-healthcare revenue for the second quarter 2023 fell below expectations as the decline in demand previously seen in lower-end consumer audio categories extended into the premium and luxury audio categories and across more geographies.

177.   On this news, the price of Masimo stock declined almost 20% from a price of $147.16 per share on July 17, 2023 to $117.73 on July 18, 2023. As the market continued to digest the news, the price of Masimo stock declined further, closing at $112.28 per share on July 19, 2023.

178.   On August 8, 2023, in an earnings press release for the second quarter of 2023, filed with the SEC on form 8-K, the Company announced consolidated revenue of $455.3 million, consisting of $281.1 million in healthcare revenue and $174.2 million in non-healthcare revenue. The press release quoted Defendant Kiani as stating "Second quarter 2023 was a tale of two realities. Our healthcare revenues and earnings declined sequentially and annually, but we gained new hospital customers at a record level, despite strong results in the prior three years, and retained existing hospital customers. We are disappointed with our results this quarter. Our updated guidance assumes inpatient volumes will not return to the levels we expected this year and we will not receive some of the new large orders we are expecting[.]"

179.   During the related earnings call held the same day, Defendant Kiani stated that, "to mitigate the impact of the shortfall on revenues," the Company would "reduce [its] expenses by $100 million."

180.   Defendant Young continued:

---

***For our healthcare segment, second quarter revenues were $281 million, reflecting a 21% decline.*** Please recall that our second quarter 2022 revenues benefitted from the shift of approximately $25 million to $30 million of revenues from the first quarter of 2022 into the second quarter due to supply chain delays in the first quarter of 2022, making the year-over-year comparison even more difficult.

For the second quarter of 2023, we missed expectations by approximately $66 million. Of this amount, approximately half was related to lower-than-expected sensor orders[.] [R]oughly 40% of the shortfall was related to large orders that had been expected but have not closed yet. The remainder was attributable to lower to weaker demand for capital equipment from hospitals as well as slower-than-expected installations.

\* \* \*

***For our non-healthcare segment, second quarter revenues were $174 million, representing a decline of 17%*** on a pro forma and constant currency basis. This business is grappling with reduced discretionary spending on high-end audio systems and a return of competitors who have previously been hampered by supply chain interruptions now being aggressive with price cuts as they get back into the market. Although we are unable to raise prices to the level we had planned coming into this year, we did not reduce our prices and have put discipline in place to sell. Based on our features and advances.

181.   On this news, the price of Masimo's stock declined from a closing price of $120.00 per share on August 8, 2023 to a closing price of $117.96 per share on August 9, 2023.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

182.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

183.   Masimo is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

184.   Plaintiff is a current shareholder of Masimo and was a continuous

shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

185.   A pre-suit demand on the Board of Masimo is futile and, therefore, excused.  At the time this action was commenced, the seven-member Board was comprised of Defendants Kiani, Mikkelson, Reynolds, Brennan, and Koffey (the "Director Defendants"), as well as Robert Chapek and Rolf Classon, who are not parties to this action. Accordingly, Plaintiff is only required to show that four Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all seven, and if not all, then at least five of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

186.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

187.   Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

188.   Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

---

189.   Defendants Mikkelson, Reynolds, and Koffey serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

190.   The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

191.   All seven of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Specifically, none of the Board's current members have taken remedial action to redress the conduct alleged herein. For instance, none of the Board's current members have sought to enforce Masimo's

Clawback Policy, which provides:

> [I]n the event we are required to restate our financial statements as a result of "material noncompliance" with the financial reporting requirements of the securities laws, we will recover from our current and former executive officers any incentive-based compensation (including stock options) that is:
>
> - based on erroneous data;
>
> - received during the three-year period preceding the date on which we become required to prepare an accounting restatement; and
>
> - in excess of what would have been paid if calculated under the restatement.

192.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

193.   The acts complained of herein constitute violations of fiduciary duties owed by Masimo's officers and directors, and these acts are incapable of ratification.

194.   The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Masimo. If there is a directors' and officers' liability insurance

policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Masimo, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

195.   If there is no directors' and officers' liability insurance, then the directors will not cause Masimo to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

196.   Thus, for all of the reasons set forth above, all seven, or if not all, then at least five of Masimo's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I
### Against the Individual Defendants for Violations of § 10(b) of the Exchange Act and Rule 10b-5

197.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

198.   The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

199.   The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading.

200.   The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

201.   The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Masimo were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

202.   The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Masimo, their control over, and/or receipt and/or modification of Masimo's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Masimo, participated in the fraudulent scheme alleged herein.

203.   As a result of the foregoing, the market price of Masimo common stock was artificially inflated at all times during the Relevant Period.

204.   In October 2021, the Board approved a stock repurchase program, authorizing the repurchase of up to 3 million shares of Company common stock. According to the Company's 2022 annual report, filed with the SEC on Form 10-K, dated March 1, 2023 (the "2022 Annual Report"), the 2021 stock repurchase was completed in May 2022.

205.   According to the 2022 Annual Report, Masimo spent $401.5 million on the repurchase of 3 million shares of Company common stock for the year ended December 31, 2022. These shares were repurchased at prices artificially inflated by the materially false and misleading statements issued, or caused to be issued, by the Individual Defendants.

206.   As a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including paying artificially inflated prices for the Masimo common stock repurchased by the Company during the Relevant Period under the 2021 stock repurchase plan, the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm.

## COUNT II
### Against the Individual Defendants for Breach of Fiduciary Duty

207.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

208.   The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

209.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

210.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

211.   As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

212.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

213.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

214.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

215.   Plaintiff on behalf of Masimo has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants for Unjust Enrichment

216.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

217.   By their wrongful acts, violations of law, and false and misleading

statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Masimo.

218. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Masimo that were tied to the performance or artificially inflated valuation of Masimo, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

219. Plaintiff, as a shareholder and a representative of Masimo, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

220. Plaintiff on behalf of Masimo has no adequate remedy at law.

<u>COUNT V</u>
**Against the Individual Defendants for Abuse of Control**

221. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

222. The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

223. As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

224. Plaintiff on behalf of the Company has no adequate remedy at law.

<u>COUNT VI</u>
**Against the Individual Defendants for Gross Mismanagement**

225. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

226. The Individual Defendants, either directly or through aiding and

abetting, failed to reasonably exercise their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the expectations and operations of a publicly held corporation.

227.  As a direct and proximate result of the Individual Defendants' gross mismanagement alleged herein, the Company has sustained and will continue to sustain substantial damages.

228.  Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT VII
### Against the Individual Defendants for Waste of Corporate Assets

229.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

230.  The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

231.  As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) causing the Company to repurchase Masimo common stock at artificially inflated prices during the Relevant Perio; (ii) paying and colleting excessive compensation and bonuses; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

232.  As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

233.  Plaintiff on behalf Masimo has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.  Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and

---

transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.     Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.     Awarding punitive damages;

D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

DATED: May 1, 2024                **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

          */s/ Rachele R. Byrd*
          RACHELE R. BYRD

BETSY C. MANIFOLD
*manifold@whafh.com*
RACHELE R. BYRD
*byrd@whafh.com*
ALEX J. TRAMONTANO
*tramontano@whafh.com*
FERDEZA ZEKIRI
*zekiri@whafh.com*
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile:  (619) 234-4599

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 56 -

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
*sdr@rl-legal.com*
Timothy J. MacFall
*tjm@rl-legal.com*
Samir Aougab
*sa@rl-legal.com*
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516

*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I, Linda McClellan, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint brought on behalf of Masimo Corporation, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: ___4/12/2024___

LINDA MCLELLAN